UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CLAUDIA WILLIAMS, f/k/a CLAUDIA
GAYLE,

                        Plaintiff,

           - against -

HARRY'S NURSES REGISTRY, INC. and
HARRY DORVILIER,

                        Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
23-CV-6661 (PKC) (TAM)

PAMELA K. CHEN, United States District Judge:

On September 7, 2023, Claudia Williams ("Plaintiff" or "Ms. Williams") brought this action against her former employers, Defendant Harry's Nurses Registry, Inc. ("HNR") and its CEO, Defendant Harry Dorvilier ("Dorvilier") (collectively, "Defendants"), for the alleged retaliatory publication of her personal identifying information ("PII") in violation of the anti-retaliation provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215, and New York Labor Law ("NYLL") § 215. (Compl., Dkt. 1.) Between September 2023 and December 2024, the parties engaged in motions practice, submitted pre-trial briefing, and participated in hearings. (*See, e.g.*, Defs.' First Answer, Dkt. 8; Proposed Trial Date Ltr., Dkt. 84.) After the Court granted defense counsel's motion to withdraw on January 16, 2025, (*see* 1/16/2025 Min. Entry), and HNR failed to secure new counsel, (*see* 3/11/2025 Dkt. Order), the Clerk of Court entered an order of default against HNR on March 14, 2025, (Dkt. 93). After Dorvilier, proceeding *pro se*, subsequently failed to appear at a March 26, 2025 status conference, (*see* 3/26/2025 Min. Entry), the Clerk of Court entered an order of default against Dorvilier on March 27, 2025, (3/27/2025 Clerk's Entry of Default). On April 4, 2025, Plaintiff moved for default judgment. (Mot. Default J., Dkt. 98.) The Court held a damages inquest on April 15, 2025, during which it heard

from Plaintiff and Plaintiff's witnesses. (*See* 4/15/2025 Min. Entry.) On April 21, 2025, Plaintiff submitted a motion for attorney's fees. (Dkt. 107.)

For the reasons set forth below, the Court grants Plaintiff's motion for default judgment against both Defendants and awards Plaintiff attorney's fees and costs as detailed below.

## BACKGROUND

I. **Factual Background**[1]

A. **The FLSA Collective Action Lawsuits Against Defendants**

In 2007, Plaintiff,[2] individually and on behalf of all others similarly situated, sued Defendants alleging, among other claims, that Defendants had violated provisions of the FLSA by failing to pay overtime wages to Plaintiff and other employees, whom Defendants had improperly classified as independent contractors. *Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672 (NGG) (MDG), 2012 WL 686860, at *1 (E.D.N.Y. Mar. 2, 2012), *aff'd*, 594 F. App'x 714 (2d Cir. 2014). At the time, Plaintiff was one of many registered nurses employed by Defendants as part of Defendants' healthcare personnel referral business. *Id.* In March 2009, Plaintiff won partial summary judgment on the issue of Defendants' liability under the FLSA and other wage claims, and a class under the FLSA was conditionally certified. *Id.* at *2. Approximately 55 other class members then opted into Plaintiff's conditional collective action ("Collective Action") against Defendants. *Id.*

In December 2010, the court granted Plaintiff summary judgment on damages, *id.*; in March 2012, the court certified the plaintiff class and granted summary judgment on the issue of

---

[1] Since Defendants have defaulted, they are deemed to have admitted all well-pleaded factual allegations, and the fact section is accordingly drawn from Plaintiff's allegations and submissions to the Court. *Finkel v. Romanowicz*, 577 F.3d 79, 81 n.1 (2d Cir. 2009).

[2] At the time, Plaintiff went by the name of "Claudia Gayle."

Defendants' liability, *id.* at *1; and in September 2012, on summary judgment, the court awarded 36 plaintiffs damages against Defendants, *Gayle v. Harry's Nurses Registry, Inc.*, 594 F. App'x 714, 716 (2d Cir. 2014) (summary order). Defendants appealed, and in December 2014, the Second Circuit upheld the various district court judgments in a summary order. *Id.* at 719. In May 2015, the Supreme Court denied certiorari. *Harry's Nurses Registry, Inc. v. Gayle*, 575 U.S. 997 (2015).

Beginning in 2021, Defendants attempted to challenge the judgment awarded to Plaintiff in the Collective Action. They filed a motion in the Second Circuit to recall the mandate, which was denied. *See Williams v. Harry's Nurses Registry, Inc.*, No. 24-CV-34, 2025 WL 842041, at *1 (2d Cir. Mar. 18, 2025) (citation omitted). They then moved this Court to reopen the case, which was denied. *Id.* (citation omitted). Defendants appealed the denial, which the Second Circuit dismissed; the Second Circuit also referred defense counsel to the Second Circuit Grievance Panel for filing a frivolous appeal. *Id.* (citation omitted). Defendants then moved the Judicial Panel on Multidistrict Litigation to transfer the Collective Action case and two other cases against them to the Southern District of Mississippi, which the panel denied as moot. *Id.* (citation omitted). Defendants then filed another motion to recall the mandate in the Second Circuit, which it once again denied. *Id.* (citation omitted).

B.    **Defendants' Retaliation Over the FLSA Lawsuits**

Not content with Defendants' exhaustion of the judicial system and the outcomes thereof, HNR's website began publishing commentaries regarding the Collective Action in or around 2022. (12/20/2023 Hr'g Tr., Dkt. 43, 44:16–45:15.) These commentaries identified the judges who had ruled in the Collective Action, publishing their official contact information and highlighting the alleged "misrepresentations" and "irregular collaboration" leading to "invalid indictments."

(Dkt. 26-1, at ECF[3] 15–20.)    The website identified plaintiffs' lawyer, ascribing "fraudulent intentions" to him and accusing him of "[b]urglariz[ing] the HNR office in 2008 to steal the [plaintiffs'] time sheets." (*Id.* at ECF 22, 36.)    HNR's website also complained of "sensationalized" "fake summonses and complaints" amounting to "one of the most significant fraudulent schemes in the United States of America's history." (*Id.* at ECF 26.) Most perniciously, and most relevant to the instant case, the posts included unredacted images of Plaintiff's social security card, her driver's license under two previous last names, and various other professional and personal paperwork that included Plaintiff's PII. (*Id.* at ECF 2–5.) The website derogatorily referred to Plaintiff as "Ghost" to reinforce Defendants' false claims that Plaintiff had engaged in identity fraud. (S*ee, e.g.*, *id.* at ECF 15 (asserting, *inter alia*, that "CLAUDIA GAYLE, also referred to as 'Ghost,' purportedly received checks from [HNR] using false information"); Compl., Dkt. 1, ¶ 13 (explaining that Plaintiff's "purported identity falsification has to do with Plaintiff's (legitimate) use of three names," i.e., her birth name and two different married names)); *Williams*, 2025 WL 842041, at *4.

## II.    Procedural History

Plaintiff commenced this action on September 7, 2023, alleging violations of the FLSA's and NYLL's anti-retaliation provisions. (Compl., Dkt. 1, at 1.)  Defendants filed their answer on September 28, 2023. (Answer, Dkt. 8.) Defendants then filed an amended answer with affirmative defenses on November 10, 2023. (Am. Answer, Dkt. 14.)

On December 7, 2023, Plaintiff filed a preliminary injunction ("PI") motion seeking to "requir[e] Defendants to remove Ms. Williams's date of birth and social security number from

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

their Internet postings." (Mem. Supp. Mot. Prelim. Inj., Dkt. 27, at 1 (stating, *inter alia*, that Defendants claimed "they ha[d] the right to" post this information).) On December 20, 2023, the Court held a hearing at which it found that Defendants had acted with a "very plainly expressed" "intent to retaliate against" Ms. Williams by publishing her PII and that this conduct "warrant[ed the] preliminary relief of taking [the PII] down." (12/20/2023 Hr'g Tr., Dkt. 43, 20:22–23, 27:24–25, 28:9–10.) The Court accordingly issued the requested PI on December 20, 2023. (Prelim. Inj., Dkt. 36.) The Court also ordered Defendants to confirm their compliance with the PI by December 22, 2023. (12/20/2023 Min. Entry.) After Defendants failed to comply with that order, the Court issued an order for Defendants to show cause why they should not be held in contempt by December 27, 2023. (12/23/2023 Order to Show Cause.) On December 27, 2023, Defendants submitted a sworn declaration that the PII had been removed. (Dkt. 38.) On December 29, 2023, Defendants appealed the PI. (Dkt. 39.)[4]

While the appeal was pending and throughout 2024, the parties continued to engage in discovery and pre-trial motion practice. On May 8, 2024, Plaintiff served Defendants with a contempt motion seeking sanctions based on Defendants' violation of the PI. (*See* Dkt. 47.) Defendants brought themselves into compliance by May 17, 2024, rendering moot Plaintiff's anticipated contempt motion. (Dkt. 48.) However, on August 6, 2024, Plaintiff once again served Defendants with a contempt motion for violating the PI based on Plaintiff's driver's license and PII appearing in a video posted on YouTube with the title, "HarryShow June 25 2024." (*See*

---

[4] The Second Circuit upheld the PI on March 18, 2025, finding that Plaintiff had set forth a "concrete, actual, and particularized injury" sufficient to support standing; that Plaintiff had established a *prima facie* case of retaliation wholly unrebutted by Defendants; that Plaintiff had made a "strong showing of irreparable harm"; and there was no "real or genuine or . . . non-delusional reason" for the PII publication that would require a balancing of interests or hardships. *Williams*, 2025 WL 842041, at *3, 5–6.

Dkts. 57, 62–63.)   On September 13, 2024, the Court held a hearing at which it found that Defendants had violated the PI and granted Plaintiff's contempt motion.  (9/13/2024 Min. Entry.) Given Defendants' contumacious conduct, the Court expanded the PI to preclude Defendants from posting Plaintiff's PII anywhere on the internet.  (*Id.*)  Additionally, finding a "reasonable prospect of future violations" of the PI, the Court established a schedule for prospective coercive contempt sanctions that included fines.  (*Id.*)  The Court also ordered Defendants to hire a third-party data privacy firm by September 27, 2024, to review all of Defendants' publications and media materials in any format to ensure that no individual's PII was being publicly disclosed by Defendants in any format or medium, and to file a status report on the data privacy firm's engagement and work within 60 days.  (*Id.*)  Finally, the Court found that Dorvilier had perjured himself in his related affidavit, (Dkt. 74-1), and fined both Dorvilier and his attorney $250 each.  (9/13/2024 Min. Entry.)

By September 27, 2024, Defendants had failed to hire the required data privacy firm, and the Court *sua sponte* extended the deadline to do so.  (9/30/2024 Dkt. Order.)   Defendants eventually met that deadline, but their first status report, filed on November 12, 2024, (Dkt. 83), contained Plaintiff's PII, requiring the Court to seal the document.  (11/12/2024 Dkt. Order.)  In addition, the report noted that more PII might be identified in Defendants' meta data, which would require data mining to conclusively ensure Defendants' compliance with the expanded PI, which the Court ordered.  (*Id.*)  On December 13, 2024, Defendants requested an extension of the deadline to complete the data mining, which the Court granted.  (12/13/2024 Dkt. Order.)

Also on December 13, 2024, the parties requested, and the Court granted, a bench trial scheduled for February 24, 2025.  (Dkt. 84; 12/13/2024 Scheduling Order.)   However, on January 10, 2025, Defendants' counsel filed a motion to withdraw as attorney.  (Dkt. 86.)  After a hearing on January 16, 2025, the Court granted the motion and warned Dorvilier, as CEO of HNR,

that HNR needed to secure new counsel by February 28, 2025, or be found in default. (1/16/2025 Min. Entry.) The Court also warned Dorvilier that failure to comply with the outstanding data mining requirement would result in monetary sanctions. (*Id.*) The trial was postponed to April 14, 2025. (1/28/2025 Scheduling Order.)

HNR failed to secure new counsel by February 28, 2025, and the Clerk of Court entered an order of default against HNR on March 14, 2025. (3/11/2025 Dkt. Order; Dkt. 93.) Remaining Defendant Dorvilier then notified the Court that he would appear *pro se*, (Dkt. 96), but failed to appear at the March 26, 2025 status conference and was similarly found in default, (3/26/2025 Min. Entry). Both Defendants being in default, the bench trial was converted to a damages inquest (the "Damages Inquest"). (*Id.*) On April 4, 2025, Plaintiff moved for default judgment. (Mot. Default J., Dkt. 98.) The Damages Inquest was held on April 15, 2025, during which the Court heard testimony from Plaintiff and witnesses regarding the damages being claimed by Plaintiff. (4/15/2025 Min. Entry.) During the Damages Inquest, "the Court found default judgment against Defendants appropriate [and] granted Plaintiff permanent injunctive relief, effective immediately, as well as the following damages: $15,000 in liquidated damages under the [NYLL]; $40,000 in damages for emotional distress; and $50,000 in punitive damages," with a written Memorandum & Order to follow. (4/15/2025 Min. Entry.)

## STANDARD OF REVIEW

Default judgments are governed by Federal Rule of Civil Procedure ("Rule") 55. *See* Fed. R. Civ. P. 55; *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011). "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "Rule 55 provides a 'two-step process' for the entry of

judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment." *Mickalis*, 645 F.3d at 128 (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).  The first step, the entry of default, "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id.*  The second step, a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation." *Id.*

District courts have "circumscribed" discretion to grant or deny a default judgment because of its severity as a sanction. *Grp. One Ltd. v. GTE GmbH*, 625 F. Supp. 3d 28, 53 (E.D.N.Y. 2022) (internal quotations and citations omitted); *see McLaughlin v. Onanafe Mgmt. Sols. LLC*, No. 22-CV-6792 (PKC) (MMH), 2024 WL 4184485, at *2 (E.D.N.Y. Sep. 14, 2024) (noting that "[t]he decision to grant or deny a default motion is 'left to the sound discretion of a district court'" (quoting *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999) (citation modified))), *R&R adopted*, 2024 WL 4355485 (E.D.N.Y. Sep. 30, 2024).  Because a defendant's admissions of all well-pleaded facts do not constitute legal admissions, the court must still assess whether a plaintiff has met her pleading burden for each element of each claim alleged. *Finkel*, 577 F.3d at 84; *Burris v. Chen*, No. 15-CV-1207 (PKC) (AYS), 2021 WL 2661129, at *4 (E.D.N.Y. June 29, 2021).  Similarly, a defendant's factual admissions are "not an admission of damages," which must be separately evaluated by the court. *Finkel*, 577 F.3d at 83 n.6 (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993)).

## DISCUSSION

### I.    Default Determination

Entries of default are appropriate where defendants have "failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Such failures to plead or otherwise defend are understood broadly. *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 454 (2d Cir. 2013) (citing *Mickalis*, 645 F.3d at 129); *see, e.g.*, *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (defendant failed to "otherwise defend" by "failing to appear for a deposition, dismissing counsel, giving vague and unresponsive answers to interrogatories, and failing to appear for trial"); *Fourtek Teknoloji Ve Guvenlik Sistemleri, A.S. v. GSI-Orient, Inc.*, No. 19-CV-3555 (RRM) (CLP), 2020 WL 2527754, at *5 (E.D.N.Y. Feb. 26, 2020) (construing defendant's failure to file an answer, oppose plaintiff's default judgment motion, or challenge the entry of default as a failure to defend (internal citation omitted)), *R&R adopted sub nom. Fourtek Teknoloji v. Guvenlik Sistemleri, A.S.*, 2020 WL 2523054 (E.D.N.Y. May 18, 2020). The entry of default is not discretionary. *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 186 (2d Cir. 2015) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . the clerk must enter the party's default." (quoting Fed. R. of Civ. P. 55(a))).

As a threshold matter, Defendants' default in this case is clear from the record. HNR was found in default because it failed to secure new representation, legally precluding it from continuing to litigate the case. *Kaplan v. Bank Saderat PLC*, 77 F.4th 110, 116 n.8 (2d Cir. 2023) ("A corporation may not appear in federal court *pro se*, and default may enter against a corporate defendant that fails to defend itself in the action by retaining counsel." (citing *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 192 (2d Cir. 2006))); *Trs. of Bldg. Trades Educ. Benefit Fund v.*

*Romero Elec. LLC*, No. 19-CV-3515 (DRH) (AYS), 2021 WL 3604811, at *4 (E.D.N.Y. July 19, 2021) (noting that courts will find a defendant's default willful where "a corporation fails to comply with a court order to obtain counsel" and collecting cases), *R&R adopted*, 2021 WL 3603613 (E.D.N.Y. Aug. 13, 2021).  Here, the Court gave Defendants six weeks to secure new corporate counsel for HNR and gave them notice that failure to do so would result in an entry of default against HNR.  (1/16/2025 Min. Entry.)  To allow HNR time to secure this new counsel, the Court deferred for a second time the deadline for Defendants to conduct the court-ordered data mining and continued *sine die* the trial that was scheduled to begin in less than six weeks. (12/13/2024 Scheduling Order; 1/16/2025 Min. Entry.)  By March 11, 2025, over a week after the Court's deadline for HNR to appoint new counsel, HNR had failed to do so.  (3/11/2025 Dkt. Order.)  Thus, the Court directed the Clerk of Court to issue a certificate of default for HNR based on its failure to retain counsel.  (*Id.*)

Similarly, Dorvilier was found in default because he repeatedly failed to comply with Court orders and failed to appear at Court hearings.  (3/26/2025 Min. Entry); *see Esquivel v. Lima Rest. Corp.*, No. 20-CV-2914 (ENV) (MMH), 2023 WL 6338666, at *2–3 (E.D.N.Y. Sep. 29, 2023) (finding in default parties that "did not comply with the Court's orders"); *Au Bon Pain*, 653 F.2d at 65 (affirming entry of default for party that, *inter alia*, "fail[ed] to appear" at trial).  During the January 16, 2025 Status Conference, the Court ordered Dorvilier to hire a new lawyer or "file a letter on the docket by [February 28, 2025] indicating that he will be proceeding *pro se.*" (1/16/2025 Min. Entry.)  Dorvilier failed to do so by March 11, 2025, and the Court gave him notice that failure to respond would cause an entry of default against him.  (3/11/2025 Dkt. Order.) Though Dorvilier did eventually file the letter, (Dkt. 96), Dorvilier then failed to appear at the March 26, 2025 Status Conference.  (3/26/2025 Min. Entry.)  Thus, the Court directed the Clerk

of Court to issue a certificate of default against Dorvilier for failure to appear or otherwise defend this action, which was entered on March 27, 2025.  (3/26/2025 Min. Entry; 3/27/2025 Clerk's Entry of Default.)

## II.   Defendants' Conduct Warrants Default Judgment

When evaluating whether to grant a default judgment, the Court must weigh "(1) whether the defendant's default was willful; (2) whether the defendant has a meritorious defense to the plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *McLaughlin*, 2024 WL 4184485, at *6 (citation omitted).

### A.   Defendants' Default was Willful

A defendant's continued failure to respond to court orders to obtain new counsel evinces willful default. *See Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001) (finding default willful where individual and corporate defendants only obtained new counsel two months after court's deadline); *GTE GmbH*, 625 F. Supp. 3d at 55 (finding default willful where defendants failed to obtain new counsel, in contravention of court orders); *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 123–24 (E.D.N.Y. 2011) (finding willful default in defendants' failure to hire new counsel and respond to court order).  As discussed *supra*, Dorvilier, as HNR's representative, was given notice that failure to abide by Court directives to appoint new counsel for HNR and to properly respond as to his own representation risked default.  And yet, Dorvilier failed to do either.  Dorvilier himself willfully failed to comply with multiple court orders throughout the case, including violating the PI and the Court's data search directive, and finally, despite telling the Court he was proceeding *pro se*, failing to appear at the March 26, 2025 pre-trial conference less than three weeks before trial was scheduled.  (*See* 3/26/2025 Min. Entry.)

Thus, the Court finds that both Defendants' default was willful.

**B.    Defendants Have Not Presented a Meritorious Defense**

A meritorious defense is the proffer of evidence which, if proven at trial, would constitute a complete defense. *GTE GmbH*, 625 F. Supp. 3d at 56–57 (collecting cases). A meritorious defense "is more than a conclusory denial[,] articulated with a degree of specificity which directly relates that defense to the allegations set forth in the plaintiff's pleadings and raises a serious question as to the validity of those allegations." *Brito v. Marina's Bakery Corp.*, No. 19-CV-0828 (KAM) (MMH), 2022 WL 875099, at *5 (E.D.N.Y. Mar. 24, 2022) (internal quotations and citations omitted). It must be "good at law so as to give the factfinder some determination to make." *Gardner v. Lefkowitz*, 737 F. App'x 597, 598 (2d Cir. 2018) (quoting *Am. All. Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996) (internal quotation marks omitted)). The defaulting defendant bears the burden of sufficiently offering evidence of a complete defense. *GTE GmbH*, 625 F. Supp. 3d at 56.

Here, Defendants have failed to challenge the defaults entered against them, and their defense to Plaintiff's broader allegations is insufficient to meet the bar at issue. Defendants' argument that Plaintiff has suffered no harm because the PII published is not hers has been dismissed as factually unconvincing. *Williams*, 2025 WL 842041, at *4 (noting that this Court was "not convinced that [the investigation] shows what [HNR] thinks it does" (internal quotation marks omitted)). Even if factually supported, this defense is legally irrelevant. *Id.* (finding no basis to disturb the district court's determination that Defendants' postings "constituted an employment action that disadvantaged [Plaintiff].")*; see* Hr'g Tr., Dkt. 43, 16:14–17 ("[e]ven if [Plaintiff is] a fraudster, . . . the posting of that accusation [of identity fraud] still would be

retaliation" (cleaned up)). Thus, there is nothing left for the factfinder to assess regarding the "validity of [Plaintiff's] allegations." *Brito*, 2022 WL 875099, at *5.

Defendants have therefore failed to show that they have a meritorious defense.

### C.    Plaintiff Would be Prejudiced by the Denial of a Default Judgment

Finally, courts must consider whether the plaintiff would be prejudiced if their motion for default judgment were denied. "A plaintiff is considered prejudiced . . . if they have no additional steps available to secure relief in this Court." *Brito*, 2022 WL 875099, at *6 (internal quotations and citations omitted); *McLaughlin*, 2024 WL 4184485, at *6. Defendants' failure to obtain new counsel precludes the availability of "additional steps" to "secure relief" and constitutes sufficient prejudice. *Trs. of Bldg. Trades Educ. Benefit Fund*, 2021 WL 3604811, at *4 (internal quotations and citations omitted). While mere delay alone is insufficient to find prejudice, the prejudicial effect of this delay might warrant a default judgment. *GTE GmbH*, 625 F. Supp. 3d at 59 (effects of delay such as "thwarting plaintiff's recovery or remedy" or "providing greater opportunity for fraud and collusion" sufficiently prejudice plaintiff (quoting *Swarna v. Al-Awadi*, 622 F.3d 123, 142 (2d Cir. 2010))).

Here, Defendants' failure to continue defending this case leaves Plaintiff with no recourse other than default judgment. In addition, Defendants' failure to abide by existing Court directives, including the removal of all PII across HNR's website, provides "greater opportunity" every day for identity theft and increased risk of harm to Plaintiff. *Id*. More broadly, the facts underlying this case stem from events that occurred nearly 20 years ago. (*See* Compl, Dkt. 1, at 1.) The fair administration of justice requires time and patience, but surely does not require more time or patience from this Plaintiff. Plaintiff would be unduly and unfairly prejudiced by anything other than a prompt resolution of this case and a default judgment.

Accordingly, Plaintiff is entitled to default judgment on all claims for which the well-pleaded allegations in the Complaint establish Defendants' liability as a matter of law. The Court considers whether Plaintiff's allegations satisfy the elements of her two claims below.

## III.    Defendants' Liability under the FLSA and NYLL

Plaintiff brings retaliation claims under the FLSA and NYLL. (*Id.*) FLSA and NYLL retaliation claims are analyzed under the same standard. *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 130 (S.D.N.Y. 2020). Courts apply the *McDonnell Douglas* three-step burden-shifting framework to such claims. *Williams*, 2025 WL 842041, at *3; *see McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). "[A] plaintiff alleging retaliation under the FLSA and NYLL 'must first establish a *prima facie* case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Williams*, 2025 WL 842041, at *3 (citing *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)). "An employment action disadvantages an employee if 'it well might have dissuaded a reasonable worker from making or supporting [similar] charge[s] . . .'" *Mullins*, 626 F.3d at 53 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (alterations in original). Once the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-[retaliatory] reason for the employment action." *Williams*, 2025 WL 842041, at *3 (quoting *Mullins*, 626 F.3d at 53 (internal quotation marks and citation omitted)). "If the defendant meets its burden, the plaintiff must produce 'sufficient evidence to support a rational finding that the legitimate, non-[retaliatory] reasons proffered by the defendant were false, and that more likely than not [retaliation] was the real reason for the employment action.'" *Id.* (quoting same).

As the Second Circuit essentially found in resolving Defendants' interlocutory appeal in this matter, Plaintiff has sufficiently pleaded a *prima facie* case of retaliation under the two statutes. *See Williams*, 2025 WL 842041, at *3–5.  First, Plaintiff participated in an activity protected under the FLSA and NYLL—the filing of the 2007 wages lawsuit—that was plainly known to the Defendants, as demonstrated by their litigation (and re-litigation) of that action.  *See Gayle*, 2012 WL 686860, at *1.  Second, Defendants subjected Plaintiff to an employment action that disadvantaged her by posting "false statements about [her] along with her PII on the internet," which the Second Circuit found to be "an employment action that disadvantaged [Plaintiff]." *Williams*, 2025 WL 842041, at *4.  Finally, as the Circuit noted, "'the sequence, timing and nature of events' surrounding the publication of the information reinforces that its predominant purpose was to get back at [Plaintiff]." *Id.* (citing *Mullins*, 626 F.3d at 54).  The Circuit found no clear error in this Court's determination that "sufficient evidence based on defendant[s'] own words in the postings, [their] rantings about having lost at the district court and Court of Appeals level, and [their] railing against all of the participants in that process, even the judges . . . makes it so clear that . . . at least the primary purpose was to get back at everybody involved in this." *Id.* at *5 (citing 12/20/2023 Hr'g Tr., Dkt. 43, 27:6–11).  Indeed, Plaintiff's pleadings in this regard were sufficient for the Circuit to find that she had "demonstrated a substantial likelihood of success on the retaliation claim based on the record." *Id.*

Based on the pleadings submitted and the Second Circuit's recent review of the same, Plaintiff has successfully established liability for her two retaliation claims, and default judgment is clearly warranted against Defendants.

## IV.    Damages

Plaintiff seeks $20,000 in liquidated damages under the NYLL as well as punitive damages and damages for emotional distress as to her retaliation claims under both the FLSA and NYLL. (Compl., Dkt. 1, at 6.)  Given Defendants' default did not entail any admissions as to Plaintiff's damages, the Court held the Damages Inquest to determine the extent of these damages.  *See Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 91 (E.D.N.Y 2020) (where damages for a default judgment are "not susceptible to simple mathematical calculation," the court may hold an evidentiary hearing) (internal citations omitted); *Fourtek*, 2020 WL 2527754, at *4 ("Where the amount of damages owed requires a judicial finding, a default judgment may be entered once the court has conducted a hearing or made a determination as to damages." (citing Fed. R. Civ. P. 55(b))).

For the following reasons, the Court grants Plaintiff liquidated damages, punitive damages, and damages for emotional distress in the amounts listed below.

### A.    Liquidated Damages

Plaintiff only seeks liquidated damages under the NYLL, which provides for mandatory liquidated damages in instances of retaliation.  N.Y. Lab. Law § 215(2)(a) ("The court shall award liquidated damages to every employee aggrieved under this section."); *Demirovic v. Ortega*, No. 15-CV-0327 (CLP), 2018 WL 1935981, at *9 (E.D.N.Y. Apr. 24, 2018), *aff'd*, 771 F. App'x 111 (2d Cir. 2019) (awarding "mandatory" liquidated damages under NYLL § 215(2)(a) against defendants who had asserted punitive and malicious counterclaims).  Plaintiff correctly does not request liquidated damages under the FLSA, which only provides such damages as a function of wage loss, and which is therefore inapplicable here.  *See* 29 U.S.C.A. § 216 (West)

(providing for liquidated damages as determined by any unpaid wages); (Compl., Dkt. 1, at 6 (requesting liquidated damages under NYLL [only])).

Plaintiff seeks the statutory maximum of $20,000 in liquidated damages under the NYLL. (Compl., Dkt. 1, at 6); *see* N.Y. Lab. Law § 215(2)(a). The Court grants Plaintiff $5,000 in liquidated damages for the retaliatory posting that triggered the instant matter in light of the "limited magnitude of the impact upon [Plaintiff]," as she was already represented by counsel when she discovered the retaliatory postings. *See Isigi v. Dorvilier,* No. 16-CV-2218 (FB), 2018 WL 1598613, at *5 (E.D.N.Y. Mar. 14, 2018) (awarding $5,000 in liquidated damages due to "limited magnitude of impact," in part because plaintiff "had ready access to reassuring legal advice about her rights" when retaliatory action happened), *R&R adopted*, 2018 WL 1597386 (E.D.N.Y. Apr. 2, 2018), *aff'd*, 795 F. App'x 31 (2d Cir. 2019). However, because Defendants subsequently re-published the PII at issue at least twice during this case, the Court grants Plaintiff an additional $5,000 for each of these two known instances of Defendants' retaliatory re-postings. *See* discussion of Defendants' repeated repostings, *supra*. The Court therefore grants Plaintiff a total of $15,000 in liquidated damages under the NYLL.

### B.    Damages for Emotional Distress

Plaintiff seeks an indeterminate amount of damages for emotional distress. (Compl., Dkt. 1, at 6.) The Second Circuit recognizes three types of emotional distress in ascending order of severity: garden variety, significant, and egregious emotional distress. *Brito*, 2022 WL 875099, at *24 (collecting cases). "In 'garden variety' emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Id.* (quoting *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)). "'Significant'

emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.* Damages for garden variety emotional distress can range from $5,000 to $125,000 in this Circuit, though awards at the higher end typically involve "harsher treatment [that] lasted for a significantly longer period of time." *McDaniel v. Scotch & Soda Retail LLC*, No. 23-CV-7859 (DLC), 2025 WL 401108, at *2 (S.D.N.Y. Feb. 4, 2025). Damages for significant emotional distress start around $50,000. *Khan v. Hip Centralized Lab'y Servs., Inc.*, No. 03-CV-2411 (DGT), 2008 WL 4283348, at *11 (E.D.N.Y. Sep. 17, 2008) (awarding $50,000 to plaintiff who required anti-depressant medication and exhibited anxiety and other emotional and physiological symptoms).

Though not explicitly characterized as such by Plaintiff, the Court sees Defendants' online retaliatory campaign as a form of "doxxing," a growing and pernicious social and internet phenomenon. *See* David Cremins, Essay, *Defending the Public Quad: Doxxing, Campus Speech Policies, and the First Amendment*, 76 Stan. L. Rev. 1813, 1816 (2024) (citing *Dox—Interest over Time*, GoogleTrends (archived May 9, 2024), https://trends.google.com/trends/explore?q=dox&date=all&geo=US [https://perma.cc/2LTS-WPD8] (showing considerable growth in internet searches for "dox" since 2010, with spikes in July 2017, June 2020, and October 2023)). Doxxing, also spelled "doxing," is generally understood as "publicly identify[ing] or publish[ing] private information about (someone) especially as a form of punishment or revenge." *Dox*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dox (last visited August 13, 2025). The term derives from Internet slang that describes the act of "dropping documents" or "dox" about a person. *See* Cremins, *supra*,

at 1815 n.4 (citing Megan Garber, *Doxing: An Etymology*, Atlantic (Mar. 6, 2014), https://www.theatlantic.com/technology/archive/2014/03/doxing-an-etymology/284283/ [https://perma.cc/2CBU-Y5V5]; Mat Honan, *What Is Doxing?*, Wired (Mar. 6, 2014, 1:03 PM) ("The word dox is the modern, abbreviated form of 'dropping dox,' an old-school revenge tactic that emerged from hacker culture in 1990s.")). While doxxing is an inherently online activity, its repercussions can be very real. *See, e.g.*, Lisa Eadicicco, *This Female Game Developer Was Harassed So Severely on Twitter She Had to Leave Her Home*, Bus. Insider (Oct. 12, 2014, at 8:46 AM PDT), https://www.businessinsider.com/brianna-wu-harassed-twitter-2014-10 (detailing how "violent and graphic death threats on Twitter," combined with the publication of her home address, led a woman and her husband to flee their home). Even where doxxing does not lead to physical-world threats, it can cause "post-traumatic stress disorder, depression, and serious emotional distress." John B. Major, Note, *Cyberstalking, Twitter, and the Captive Audience: A First Amendment Analysis of 18 U.S.C. § 2261A(2)*, 86 S. Cal. L. Rev. 117, 126 (2012) (internal citations omitted).

Although there is relatively little case law specifically addressing the harm caused by doxxing, there is abundant case law recognizing the concrete and compensable harms caused by privacy violations. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (recognizing the "disclosure of private information" as an injury "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts"); *Williams*, 2025 WL 842041, at *3 (finding Defendants' alleged intentional and ongoing exposure of Plaintiff's PII to be sufficiently "concrete because of the 'close relationship' between a 'data exposure injury and the common law analog of public disclosure of private facts'") (quoting *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 287 (2d Cir. 2023)); *see also* Restatement (Second)

19

Torts § 652D ("One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of . . . privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."). Additionally, as discussed *supra*, the Circuit has already determined in this case that the publication of Plaintiff's PII can constitute a retaliatory act under the FLSA and NYLL. *Williams*, 2025 WL 842041, at *4 (finding no clear error in district court's assessment that Defendants' intent in publishing Plaintiff's PII was to "get back at [her]"). Therefore, though a more recent phenomenon, doxxing causes the same types of harm as traditional forms of privacy invasion and thus qualifies as a form of retaliatory conduct under the FLSA and NYLL that gives rise to concrete, compensable harm.

Indeed, during the Damages Inquest, Plaintiff and two witnesses testified to the anxiety, personality changes, and emotional distress suffered by Plaintiff due to Defendants' retaliatory online harassment campaign. The Court found this testimony "very credible" and having "established that [Plaintiff] has suffered and continues to suffer both emotional distress and physical manifestations of that distress in the form of heart palpitations, or racing, for which she has self-medicated on what appears to be a pretty continuous basis." (Damages Inquest Tr., Dkt. 113, at 60:23–61:3.) The Court further found that Plaintiff had "legitimate fears and concerns about what might befall her as a result of [her PII] having been posted on the internet." (*Id.* at 61:7–8.) Plaintiff testified that these emotional and physical symptoms were recurring because "she just didn't know whether or not [Dorvilier] was going to stop." (*Id.* at 61:20–21.) Finally, Plaintiff's two witnesses testified to the change in Plaintiff's emotional and mental state triggered by Defendants' retaliatory postings. (*See, e.g., id.* at 11:14–12:19, 21:10–22:25.)

Accordingly, the Court finds that Plaintiff has provided evidence establishing emotional distress at the high end of regular garden variety emotional distress. Plaintiff's anxiety, need for self-medication as a registered nurse, and behavioral changes, as corroborated by Plaintiff's longtime friends under oath, in addition to the extended time Plaintiff has had to live with the threat of her PII being exposed to the world, support an award that approaches those granted to victims of more significant emotional distress. The Court accordingly awards Plaintiff $40,000 in damages for emotional distress.

### C.    Punitive Damages

Courts have awarded punitive damages for retaliation under the FLSA to "punish the defendant and to deter him and others from similar conduct" where such conduct has been found to be malicious or reckless. *Greathouse v. JHS Sec. Inc.*, No. 11-CV-7845 (PAE) (GWG), 2015 WL 7142850, at \*7 (S.D.N.Y. Nov. 13, 2015), *R&R adopted*, 2016 WL 4523855 (S.D.N.Y. Aug. 29, 2016) (quoting *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir.1996)); *Jones v. Pawar Bros. Corp.*, No. 17-CV-3018 (PKC) (SJB), 2023 WL 6214213, at \*5 (E.D.N.Y. Sep. 25, 2023), *appeal withdrawn*, No. 23-CV-7385, 2024 WL 1609743 (2d Cir. 2024). Courts in this Circuit assess recklessness or malice under the Title VII standard, namely, whether "the employer[ knew] that it may be acting in violation of federal law," or alternatively, whether the employer engaged in "egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." *Azkour v. Little Rest Twelve*, No. 10-CV-4132 (RJS), 2015 WL 631377, at \*9 (S.D.N.Y. Feb. 12, 2015) (internal citations omitted) (collecting cases), *aff'd sub nom. Azkour v. Little Rest Twelve, Inc.*, 645 F. App'x 98 (2d Cir. 2016).

To determine the amount of punitive damages, courts apply the *Gore* three-factor analysis: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the punitive damages

award to the actual harm inflicted on the plaintiff; and (3) the relationship between the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (citing *BMW of North America Inc. v. Gore,* 517 U.S. 559, 575 (1996)). Punitive damages can far outstrip compensatory damages where the economic harm is low but the reprehensibility of the conduct is high. *Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2012).

Defendants' contumacious conduct warrants a high punitive damages award. This Court found the retaliatory postings underpinning Plaintiff's initial allegations to be "willful[]" and "outrageous." (Damages Inquest Tr., Dkt. 113, at 65:17–23); *see Williams*, 2025 WL 842041, at *4 (finding "no clear error in [this Court's] factual determination). The evidence further establishes that Defendants had ample notice that the posting of Plaintiff's PII was likely "in violation of federal law." *Azkour*, 2015 WL 631377, at *9. Even after the Court had effectively found that the posting of Plaintiff's PII was illegally retaliatory, thus supporting the grant of a PI requiring it to be removed, Defendants flagrantly re-posted Plaintiff's PII at least twice more.

Though Plaintiff has not (yet) suffered economic harm, the Court finds, based on the evidence already discussed, that Defendants' online harassment of Plaintiff and publication of her PII was plainly reprehensible. This conduct was unmistakably and maliciously intended to harm Plaintiff psychologically, emotionally, and economically, simply because Plaintiff participated in a successful collective action lawsuit against Defendants. (*See, e.g.*, Damages Inquest Tr., Dkt. 113, at 30:10–25 (discussing potential economic harm due to impact of Defendants' postings on Plaintiff's professional reputation); *id.* at 55:22–55:6 (discussing finding of retaliatory intent).) The plainly reprehensible nature of Defendants' conduct is further demonstrated by their persistence in maintaining the harassment campaign against Plaintiff throughout this litigation,

22

undeterred by the Court's orders.  This conduct has required the Court to find Defendants in contempt, (9/13/2024 Min. Entry), Plaintiff to brief a second contempt motion, (Dk. 47), and the Court to expand the PI to include, among other things, a third-party guarantor of Defendants' compliance with the PI and this Court's close supervision of the same, (9/13/2024 Min. Entry). To this day, nearly two years since the start of the case and over 20 months since Plaintiff was granted the initial PI, Defendants have yet to comply with the Court's orders and the law.  (*See* Damages Inquest Tr., Dkt. 113, at 64:7–65:16 (discussing Defendants' failure to complete the ordered data mining); *see also* Mot. Compel, Dkt. 114 (drawing the Court's attention to a post by Dorvilier regarding Plaintiff dated July 1, 2025).)  Indeed, Plaintiff's latest filing, (Pl. Status Report, Dkt. 115 (confirming ongoing violation)), makes clear that Defendants are continuing to illegally publish Plaintiff's PII—which renders the financial relief the Court grants Plaintiff in this matter not fully satisfying.

Based on the applicable standards and relevant evidence in this case, the Court grants Plaintiff $50,000 in punitive damages.  Defendants have failed to make a showing or submit any evidence that they cannot pay this award.  *See Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) (defendants' inability to pay a punitive damages award is a factor in determining the award amount); *Brito*, 2022 WL 875099, at *25–26 (failure to submit relevant evidence does not preclude a punitive damages award).  Indeed, Defendants have refused to comply with Plaintiff's punitive damages discovery requests.  (*See* Dkt. 92 (moving to compel punitive damages discovery); 3/14/2025 Min. Entry (deferring ruling on Plaintiff's discovery motion).)  The Court now denies as moot Plaintiff's related motion to compel this discovery.  (Dkt. 92.)

## V.        Attorney's Fees

Plaintiff also requests attorney's fees in the amount of $118,770 and taxable costs in the amount of $3,913.37.  (Pl.'s Mem. Supp. Mot. Att'y Fees, Dkt. 110, at 8–9.)  Defendants have submitted no briefing on this issue.

As the prevailing party in this action, Plaintiff is entitled to an award of "reasonable" attorney's fees and costs under both the FLSA and NYLL.   29 U.S.C. § 216(b); N.Y. Lab. Law § 663(1).   While the district court has "considerable discretion in determining what constitutes reasonable attorney's fees," *Holick v. Cellular Sales of New York, LLC*, 48 F.4th 101, 105–06 (2d Cir. 2022) (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 151 (2d Cir. 2008)), "the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee,'" *Jones*, 2023 WL 6214213, at *6 (quoting *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)).  Reasonable hourly rates are based on "rates prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation."   *Id.* (internal quotation marks and citations omitted).   "The party seeking an award of fees has the obligation to submit contemporaneous time records that specify, for each attorney, the nature of the work done, the hours expended, and the dates."  *Id.* (citing *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir. 1983)).

Plaintiff requests a rate of $500 per hour for work performed by counsel in an attorney function, and a rate of $150 per hour for work performed by counsel in a paralegal function.  (Pl.'s Mem. Supp. Mot. Att'y Fees, Dkt. 110, at 7.)  Courts in this district "have recently awarded hourly rates ranging from $300 to $450 for partners, $200 to $325 for senior associates, $100 to $200 for junior associates, and $70 to $100 for legal support staff in FLSA cases."   *Jones*, 2023

WL 6214213, at *6 (collecting cases) (internal citations omitted).  Plaintiff advances two arguments in favor of an hourly rate slightly higher than the district norm formerly applied: 1) rather than being a standard FLSA case, this case "involved unusual issues in the emerging area of 'doxxing'"; and 2) this district norm has been outstripped by inflation and is no longer current. (Pl.'s Mem. Supp. Mot. Att'y Fees, Dkt. 110, at 3–4.)

The Court accepts Plaintiff's requested hourly rate of $500 for attorney work.  The Court finds the first argument unconvincing, as Plaintiff brought and briefed this case under existing law—which the Court notes provides sufficient legal basis for Plaintiff's recovery—rather than under the emerging area of "doxxing" that this Court refers to in its discussion of damages. However, the Court is receptive to Plaintiff's second argument and will follow other decisions in this district in this regard.  *See, e.g.*, *Polyakov v. Pen Enters., Inc.*, No. 23-CV-7816 (KAM) (RML), 2025 WL 1682721, at *6 (E.D.N.Y. June 16, 2025) (finding an hourly rate of $500 to be reasonable for a partner with more than 20 years of experience); *Canales v. Norwich Serv. Station Inc.*, No. 20-CV-4759 (JMW), 2021 WL 5759727, at *5 (E.D.N.Y. Dec. 3, 2021) (finding an hourly rate of $500 to be reasonable for a named partner).  Plaintiff's counsel's extensive experience litigating FLSA cases, including the original Collective Action case, further supports Plaintiff's counsel's increased hourly rate, given the presumed efficiency with which Plaintiff's counsel could litigate the instant matter.  The Court notes that, although this case ended with Defendants defaulting, that occurred only three weeks before trial, and the case required Plaintiff to file more motions than in a typical litigation, *e.g.*, a preliminary injunction motion, two contempt and one sanctions motions, opposition to an interlocutory appeal, and a motion to compel default-judgment-related discovery.  Finally, Plaintiff's counsel's evident skill in securing a favorable outcome also supports the increased hourly rate.  *See Polyakov*, 2025 WL 1682721, at *6 ("The

risks of litigation are high as 'FLSA claims typically involve complex mixed questions of fact and law,'" (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981)). However, the Court slightly decreases the total number of hours, noting that Plaintiff's counsel billed individual activities on the same day separately. As billing is done in block increments, this creates marginal increases in total time which are likely not accurate reflections of the time spent. The Court therefore decreases the total number of hours Plaintiff's counsel spent litigating this case from 246.3 attorney hours to 220, which lowers the total amount of those fees to $110,000.

Plaintiff's counsel, who is a solo practitioner, has appropriately applied a far lower hourly rate of $150 to tasks that would ordinarily be handled by a paralegal, but this rate is still higher than the average paralegal rate. *See Jones v. Pawar Bros. Corp.,* No. 17-CV-3018 (PKC) (SJB), 2023 WL 6214213, at *7 (E.D.N.Y. Sep. 25, 2023), *appeal withdrawn*, No. 23-7385, 2024 WL 1609743 (2d Cir. Mar. 18, 2024) ("Courts in the Eastern District have recently awarded hourly rates ranging from . . . $70 to $100 for legal support staff in FLSA cases" (internal citation omitted)). The Court does not find that the same inflation argument justifies Plaintiff's request for his paralegal-type work to be compensated at an hourly rate that is 1/3 higher than what is usually granted. The Court therefore reduces the hourly rate for the "paralegal" services that Plaintiff's counsel performed from $150 to $100, which lowers the total fee amount for the 14.8 hours of paralegal work from $1,980 to $1,480. The Court also finds Plaintiff's costs to be reasonable and adequately documented.

Accordingly, the Court grants Plaintiff attorney's fees and costs totaling $115,393.37.

## VI.    Injunctive Relief

Finally, Plaintiff requests permanent injunctive relief enjoining Defendants from any conduct violating the rights of the Plaintiff as secured by the FLSA and NYLL, which includes

precluding Defendants from posting any retaliatory internet and social media posts pertaining to Plaintiff and requiring Defendants to delete all currently existing retaliatory online and social media posts related to Plaintiff.  (*See* Pl.'s Trial Br., Dkt. 104, at 2.)  Plaintiff also requests that this Court retain jurisdiction to enforce this injunctive relief.  (*Id.*)  Immediately following the Damages Inquest, the Court granted an amended form of Plaintiff's request for injunctive relief, which it merely confirms in this opinion.  (Permanent Inj., Dkt. 106); *see Kelly Toys Holdings, LLC v. alialialiLL Store*, 606 F. Supp. 3d 32, 51 (S.D.N.Y. 2022) (awarding permanent injunction preventing defendant from re-violating relevant statutes as to plaintiffs where preliminary injunction to same effect previously ordered); *United States v. Kafeiti*, No. 18-CV-6581 (JMA) (AYS), 2019 WL 5310128, at *2 (E.D.N.Y. Oct. 21, 2019) (same).  Given the permanent injunction has already been issued, the Court considers this request for relief to be moot.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for default judgment is granted and Plaintiff's motion for attorney's fees is granted in part.  The Court awards the following damages:

1)  $15,000 in liquidated damages under the NYLL;

2)  $40,000 in emotional distress damages;

3)  $50,000 in punitive damages;

4)  $115,393.37 in attorney's fees and costs; and

5)  Post-judgment interest to accrue at the federal statutory rate, to be calculated by the Clerk of Court, until the judgment is paid in full.[5]

---

[5] Pursuant to 28 U.S.C. § 1961, "the award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered." *Brito*, 2022 WL 875099, at *27 (quoting *Tru-Art Sign Co. v. Loc. 137 Sheet Metal Workers Int'l Ass'n*, 852 F.3d 217, 223 (2d Cir. 2017) (internal quotation marks and citation omitted)); *see also Tacuri v. Nithin Constr. Co.*, No. 14-CV-2908 (CBA) (RER), 2015 WL 790060, at *12 (E.D.N.Y. Feb. 24, 2015) (awarding

The Court also denies as moot Plaintiff's motion to compel financial discovery.  (Dkt. 92.)  The Clerk of Court is directed to enter judgment, jointly and severally, against Defendants Harry's Nurses Registry, Inc., and Harry Dorvilier and close the case.

SO ORDERED.

_/s/ Pamela K. Chen_
Pamela K. Chen
United States District Judge

Dated:  August 28, 2025
        Brooklyn, New York

---

plaintiffs post-judgment interest, despite their failure to request this, on all sums awarded concerning their FLSA and NYLL wage-and-hours claims).